IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>NATHAN WILNAU,<br><br>Defendant. | CR 25-62-BLG-SPW-2<br><br>ORDER ON MOTION TO SUPPRESS |

Before the Court is Defendant Nathan Wilnau's Motion to Suppress. (Doc. 93). Wilnau seeks to suppress all evidence obtained pursuant to a state court search warrant issued on June 16, 2023, which authorized the collection of his cell-site location data. (*Id.* at 1). He argues that the confidential informant who served as the basis for the warrant was unreliable, and that the information provided was not sufficiently corroborated. (Doc. 94 at 16, 18). The Government opposes the Motion. (Doc. 101).

For the following reasons, the Court denies Wilnau's Motion.

**I.    Background**

On June 15, 2023, Montana Division of Criminal Investigation Agent Michael Bennett met with a confidential source of information (SOI) in Billings, Montana. (Doc. 102-1 at 2). At the time, the SOI was under investigation for possession of

1

dangerous drugs with the intent to distribute. (*Id.*). Specifically, the SOI had been found in possession of psilocybin mushrooms and approximately 80 to 90 grams of suspected methamphetamine. (*Id.* at 3). The SOI, who was on probation with the State of Montana, admitted to both using and distributing methamphetamine. (*Id.* at 2).

During the interview, Agent Bennett questioned the SOI about unidentified drug users and distributors in the Billings area. (*Id.*). The SOI disclosed that a woman named Christina Hill, who resided in Billings but was originally from San Francisco, California, and a man known as "Nate" were partners in distributing methamphetamine locally. (*Id.* at 2–3). According to the SOI, Hill was the leader of the operation and Nate acted as a "lieutenant." (*Id.* at 2). The SOI stated that Hill and Nate lived together. (*Id.* at 3).

The SOI further reported that $35,000 had been sent to San Francisco via UPS earlier that morning. (*Id.* at 2–3). Once the money was received, a shipment containing 50 pounds of methamphetamine was expected to be sent to Cody, Wyoming. (*Id.* at 3). The SOI claimed that Nate would travel to Cody in a red Dodge Durango to retrieve the methamphetamine and return to Billings. (*Id.*).

The SOI provided a description of Hill and Nate's residence and allowed Agent Bennett to review text messages on the SOI's phone. (*Id.*). The SOI also gave Agent Bennett phone numbers for both Hill and Nate. (*Id.*). Agent Bennett

confirmed that the number provided for Nate was saved in the SOI's contacts under the name "Nate." (*Id.*). He then conducted an open-source search of the number and determined it was registered with Verizon Wireless. (*Id.*). In a text exchange between the SOI and Hill, Hill instructed the SOI to have the "fungus" ready—a term Agent Bennett recognized as slang for psilocybin mushrooms. (*Id.*).

Agent Bennett corroborated much of the SOI's information. That same day, Montana Probation and Parole searched the SOI's residence and seized psilocybin mushrooms, consistent with the text messages between the SOI and Hill. (*Id.*). Agent Bennett also verified that the phone number provided for Hill matched the one listed on her public Facebook profile. (*Id.*).

Agent Bennett conducted surveillance at the residence described by the SOI and observed Hill standing in front of a red Dodge Durango with Wyoming license plates. (*Id.*). The vehicle matched the SOI's description of the one Nate would drive to Wyoming to pick up the methamphetamine. (*Id.*).

The SOI did not provide a last name for Nate, but Agent Bennett identified Nate as Defendant Nathan Wilnau. (*Id.* at 2–3). A review of law enforcement records revealed a prior traffic stop involving both Hill and Wilnau, during which they were found together in a vehicle and in possession of methamphetamine. (*Id.* at 3). Agent Bennett also reviewed their criminal histories, which included prior drug-related convictions. (*Id.*).

On June 16, 2023, Agent Bennett applied for a search warrant to obtain GPS data from the cell phone number associated with Nate. (*Id.* at 1). He requested historical location data dating back to May 1, 2023, including call detail records, tower location data, available GPS, and precision location information. (*Id.* at 2). He also sought real-time GPS pings for a 30-day period from Verizon Wireless. (*Id.*).

Agent Bennett signed the warrant application at 1:10 p.m. on June 16, 2023, and presented it to Montana State District Court Judge Colette B. Davies, who found probable cause and signed the warrant at 1:14 p.m. (*Id.* at 5–6, 9). Verizon Wireless subsequently provided "[r]eal time GPS coordinate data in 15-minute increments between 06/16/2023 and 06/22/2023" for the phone. (*Id.* at 10).

Using the GPS data, Agent Bennett tracked the phone as it traveled to Cody and returned to Billings. (Doc. 101-1 at 3–4). He then contacted Montana Highway Patrol Trooper Erick Fetterhoff, who conducted an investigative traffic stop for a moving violation. (*Id.* at 4). Wilnau was a passenger in the vehicle and admitted there was enough narcotics in the vehicle to "go to jail." (*Id.*). The vehicle was ultimately seized and searched pursuant to a search warrant, and agents discovered approximately ten pounds of methamphetamine inside. (*Id.* at 5–7).

/ / /

/ / /

## II. Legal Standard

A defendant may challenge the admissibility of evidence prior to trial under Federal Rule of Criminal Procedure 12(b)(3)(C), which governs motions to suppress evidence. The foundation for such challenges lies in the Fourth Amendment, which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

"In order to effectuate the Fourth Amendment's guarantee of freedom from unreasonable searches and seizures, [the United States Supreme] Court . . . conferred upon defendants in federal prosecutions the right, upon motion and proof, to have excluded from trial evidence which had been secured by means of an unlawful search and seizure." *Simmons v. United States*, 390 U.S. 377, 389 (1968) (citing *Weeks v. United States*, 232 U.S. 383 (1914)).

When law enforcement violates a defendant's Fourth Amendment rights, the exclusionary rule mandates that "all evidence seized as a result of the [violation] must be suppressed as the fruit of the poisonous tree." *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001). A defendant has the ultimate burden of proof on a Fourth Amendment motion to suppress. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005).

///

///

### III. Discussion

Wilnau first urges the Court to apply state law in evaluating probable cause for the search warrant under the Stored Communications Act (SCA), 18 U.S.C. §§ 2701–2713. He then contends that the warrant application failed to establish sufficient probable cause. The Court considers each argument in turn.

#### A.   *Stored Communications Act*

Evidence obtained through a search and seizure that complies with federal constitutional standards is admissible in federal court. *United States v. Chavez-Vernaza*, 844 F.2d 1368 (9th Cir. 1987); *Elkins v. United States*, 364 U.S. 206 (1960); *United States v. Miranda-Guerena*, 445 F.3d 1233 (9th Cir. 2006). Wilnau incorrectly contends that the SCA mandates the application of state substantive law in evaluating the validity of the search warrant. The SCA merely sets forth jurisdictional requirements for issuing so-called "ping" warrants and permits state courts to authorize the collection of cell phone location data. *See United States v. Bundy*, 195 F. Supp. 3d 1170, 1173 (D. Or. 2016).

The Court reviews each provision of the SCA cited by Wilnau and concludes neither supports his position.

##### 1.   *18 U.S.C. § 2703(a)*

Wilnau first relies on 18 U.S.C. § 2703(a), which permits the government to compel disclosure of electronic communications through a warrant issued under

6

either the Federal Rules of Criminal Procedure or, for state courts, "state warrant procedures." 18 U.S.C. § 2703(a), (b)(1)(A). He argues this language requires the Court to assess probable cause under Montana law. (Doc. 94 at 10).

In response, the Government cites *United States v. Westfall*, 142 F.4th 1208, 1213 (9th Cir. 2025), which clarified that the SCA "only addresses the specific method or particular way to issue a warrant"—not the substantive standard for probable cause. (citation modified). The Ninth Circuit explained "state warrant procedures" means only that "[t]he SCA incorporates provisions of state law that address specific methods for issuing a warrant. When state courts . . . authorized to issue warrants under state law issue warrants under the SCA, they must follow state law governing warrant procedures." *Westfall*, 142 F.4th at 1216 (internal citations omitted).

The Ninth Circuit in *Westfall* cited Montana Code Annotated § 46-5-221 as governing state warrant procedures. *Id.* at 1217. The statute specifies who may apply for a warrant, permits applications in person, electronically, or by phone, and requires they be made under oath or affirmation. Mont. Code Ann. § 46-5-221. Like federal law, it mandates that the warrant application "state[] facts sufficient to support probable cause to believe that an offense has been committed." *Id.* § 46-5-221(1). However, it does not establish a Montana-specific substantive standard for probable cause.

Although Wilnau is correct that *Westfall* did not involve identical facts, the decision directly contradicts his interpretation of the SCA. Like the defendant in *Westfall*, Wilnau contends that "state warrant procedures" encompasses more than mere procedural rules. However, the Ninth Circuit expressly rejected that argument in *Westfall*, 142 F.4th at 1216. The Ninth Circuit's analysis of probable cause is particularly instructive and reflects a broader judicial consensus: even when courts apply state law to govern warrant procedures, they evaluate probable cause under federal standards. *See id.* at 1213–15.

Wilnau's reliance on 18 U.S.C. § 2703(a) is therefore misplaced—it does not support his contention that state law applies.

2.  *18 U.S.C. § 2703(d)*

Next, Wilnau cites 18 U.S.C. § 2703(d), which states, "In the case of a State governmental authority, such a court order shall not issue if prohibited by the law of such State." Section 2703(d), however, "does not set forth the requirement for warrants but rather court orders."[1] *United States v. Ortega-Yescas*, No. CR 19-06-BU, 2019 WL 2299749, at *4 n.2 (D. Mont. May 30, 2019). In the present case, the state court issued a warrant supported by probable cause, not merely a § 2703(d)

---

[1] In *Carpenter v. United States*, 585 U.S. 296, 319–20 (2018), the Supreme Court held that § 2703(d) violates the Fourth Amendment insofar as it authorizes court orders for cell phone location data based on a standard lower than probable cause.

8

order. Accordingly, § 2703(d) is inapplicable and has no bearing on whether state or federal law governs the probable cause analysis.

The Court therefore applies federal law to assess the sufficiency of the search warrant application.

### B. *Probable Cause*

Following Wilnau's discussion on the application of state law, he turns to his contention that Agent Bennett's search warrant application lacked probable cause. Upon review of the application, the Court finds that it was supported by sufficient probable cause and concludes that the warrant was properly issued.

To be valid, a search warrant "must be supported by an affidavit establishing probable cause." *United States v. Stanert*, 762 F.2d 775, 778 (9th Cir. 1985). "In reviewing the validity of a search warrant, a court is limited to the information and circumstances contained within the four corners of the underlying affidavit." *Id.* (citing *United States v. Taylor*, 716 F.2d 701 (9th Cir. 1983)). Even when a search warrant relies in part on problematic information, it may nevertheless be upheld "as long as the untainted portions contain a sufficient showing of probable cause to render the warrant valid." *United States v. Driver*, 776 F.2d 807, 812 (9th Cir. 1985).

Probable cause exists when, under the totality of the circumstances, there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. King*, 985 F.3d 702, 707 (9th Cir. 2021) (quoting *United*

States v. Diaz, 491 F.3d 1074, 1078 (9th Cir. 2007)). This standard "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). It demands less evidence than would be required to sustain a conviction and "may rest upon evidence which is not legally competent in a criminal trial." *United States v. Ventresca*, 380 U.S. 102, 107 (1965) (citations omitted).

Probable cause must be determined by a neutral and detached magistrate. *Johnson v. United States*, 333 U.S. 10, 14 (1948). Once that determination is made, it is entitled to substantial deference by reviewing courts. *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (citation omitted). The reviewing court's role is not to second-guess the magistrate, but to ensure there was a "substantial basis" for concluding that probable cause existed. *King*, 985 F.3d at 708 (quoting *Gates*, 462 U.S. at 238). In making that assessment, "[t]he experience of a trained law enforcement agent is entitled to consideration." *United States v. Arrellano-Rios*, 799 F.2d 520, 523 (9th Cir. 1986).

When probable cause is based on an informant's tip, the central question is reliability. *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993). "Because there is no checklist for what makes an informant reliable, courts consider a wide range of factors." *United States v. Waldeck*, 664 F. Supp. 3d 1169, 1179 (D. Mont. 2023). "[C]ourts generally consider whether the informant is identifiable . . . [and] whether the informant's basis of knowledge is apparent." *Id.* "[A] known

informant's tip is thought to be more reliable than an anonymous informant's tip." *United States v. Rowland*, 464 F.3d 899, 907 (9th Cir. 2006); *see also United States v. Romain*, 393 F.3d 63, 73 (1st Cir. 2004) (noting that a face-to-face encounter with an informant bolsters credibility because it allows officers to directly assess the informant's reliability).

Moreover, "information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence." *Williams*, 10 F.3d at 593. "If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." *Id.*; *Waldeck*, 664 F. Supp. 3d at 1179 (noting that "whether the informant has a track record for providing good information" weighs in favor of reliability).

Here, a commonsense reading of the search warrant application supports the conclusion that probable cause existed. The application established a fair probability that the cell phone's contents and location data would yield evidence of drug trafficking.

Wilnau disputes Agent Bennett's identification of him as "Nate," arguing that it lacked a sufficient basis because it relied primarily on a prior police report placing

Hill and Wilnau together in a vehicle containing methamphetamine, as well as Wilnau's prior drug-related offenses. (Doc. 94 at 18). Although Agent Bennett referred to Wilnau by name throughout the application, it was not necessary to establish that "Nate" was in fact Wilnau. The warrant's objective was to track Nate's location and gather evidence of his drug trafficking activities, regardless of his precise identity. The relevant inquiry in assessing the warrant's validity is whether the affidavit demonstrated probable cause that the phone's location data would yield evidence of drug trafficking—not whether it established probable cause to arrest Wilnau. Even after excising Agent Bennett's identification of Nate as Wilnau, along with the references to Wilnau's criminal history and prior traffic stop with Hill, the affidavit still provided probable cause that the phone's location data would reveal evidence of drug trafficking.

The affidavit was based on Agent Bennett's tip from a known drug user and distributor implicating "Nate." Although law enforcement had not previously relied on this SOI, several factors supported reliability. First, the SOI's identity was known, and Agent Bennett interviewed them in person. (Doc. 102-1 at 2). Second, Agent Bennett assessed the SOI's basis of knowledge by reviewing their phone, which contained text messages with Hill that indicated shared involvement in drug trafficking. (*Id.* at 3).

12

Third, Agent Bennett corroborated key details: the SOI reported that Hill and Nate distributed drugs in the Billings area, that $35,000 had been sent to San Francisco (Hill's hometown), and that methamphetamine would be shipped to Cody, Wyoming, where Nate would retrieve it in a red Dodge Durango. (*Id.* at 2–3). Agent Bennett confirmed Hill's San Francisco ties and observed Hill and a red Dodge Durango with Wyoming plates at the Billings residence described by the SOI. (*Id.* at 3).

Additional corroboration came from text messages on the SOI's phone, including one from Hill instructing the SOI to have the "fungus" ready—a term Agent Bennett recognized as slang for psilocybin mushrooms. (*Id.*). Montana Probation and Parole's search of the SOI's residence yielded psilocybin mushrooms, consistent with those texts. (*Id.*). Agent Bennett also verified that the phone number provided for Hill matched the number on her Facebook page, and that the number for Nate was saved in the SOI's phone as "Nate." (*Id.*).

Finally, Wilnau emphasizes that the SOI was on probation, but this fact does not undermine their reliability. The SOI made statements against penal interest "by admitting to the previous use and distribution of dangerous drugs such as Methamphetamine," which enhanced their credibility. (*Id.* at 2). Additionally, the SOI had a compelling incentive to provide truthful information, as any falsehoods would jeopardize their prospects for leniency. Their direct involvement in drug

transactions with Hill, evidenced by text messages, further supports reliability. Probation status is "simply part of the reliability assessment and do[es] not fatally undermine the accurate, independently verifiable information that [the SOI] provided." *Waldeck*, 664 F. Supp. 3d at 1180.

## IV. Conclusion

Relying solely on the facts contained within the four corners of the search warrant application,[2] the Court concludes the informant was reliable and probable cause existed to issue the warrant. The informant's statements, supported by Agent Bennett's corroboration, provided adequate grounds to believe the cell phone's data would yield evidence of drug trafficking.

IT IS HEREBY ORDERED that Defendant Nathan Wilnau's Motion to Suppress (Doc. 93) is DENIED.

DATED this 17th day of November, 2025.

SUSAN P. WATTERS
United States District Judge

---

[2] Wilnau emphasizes the Government's reliance on facts outside the four corners of the search warrant application. Specifically, he points to the SOI's statement that Wilnau was "not going back to prison," and the Government's assertion that this remark further corroborates the information provided by the SOI. (Doc. 111 at 2). The remaining corroborative facts cited by the Government, however, appear within search warrant application. Based on those facts alone, the Court finds that the probable cause standard is clearly satisfied.